IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

DUANE WRIGHT,

        Plaintiff,

vs.

JOHN FAYRAM, Warden, WILLIAM
SPERFSLAGE, Deputy Warden;
TRACY DIETSCH, Treatment
Director,

        Defendants.

No. C13-0078

REPORT AND RECOMMENDATION

---

## TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................ 3

II.   **PROCEDURAL HISTORY** ...................................... 3

III.  **RELEVANT FACTS** ............................................. 3
    **A.**   *First Lawsuit* ............................................. 3
    **B.**   *After the First Lawsuit* ................................... 4
    **C.**   *Religious Publications* .................................... 5
    **D.**   *Institutional Account* ..................................... 8
    **E.**   *"The Five Percenter"* ..................................... 9
    **F.**   *Mail* ..................................................... 11

IV.  **DISCUSSION** ................................................. 13
    **A.**   *Applicable Legal and Procedural Framework* ............... 13
        **1.**   *Article III Standing — Ripeness Doctrine* ............. 13
        **2.**   *Exhaustion of Administrative Remedies* ................ 14
        **3.**   *Color of State Law* ................................... 14
        **4.**   *Sincerely Held Religious Beliefs* ..................... 15
        **5.**   *Substantial Burden* ................................... 15
        **6.**   *Turner Factors* ...................................... 15
    **B.**   *Application* ............................................. 16
        **1.**   *Religious Publications and Institutional Account* ........ 16

|  |  | a. | *Article III Standing* . . . . . . . . . . . . . . . . . . . . . . | 16 |
|  |  | b. | *Exhaustion of Administrative Remedies* . . . . . . . . . . | 17 |
|  | 2. |  | *"The Five Percenter" Newspaper* . . . . . . . . . . . . . . . . . . | 18 |
|  |  | a. | *Exhaustion of Administrative Remedies* . . . . . . . . . . | 18 |
|  |  | b. | *Substantial Burden* . . . . . . . . . . . . . . . . . . . . . . | 20 |
|  |  | c. | *Legitimate Penological Objectives* . . . . . . . . . . . . . . | 20 |
|  |  |  | (1) *Is There a "Valid Rational Connection" Between the Restrictions on "The Five Percenter" and the Prison's Legitimate Interests?* . . . . . . . . . . . . . . . . . . . . . . | 20 |
|  |  |  | (2) *Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?* . . . . . . . | 21 |
|  |  |  | (3) *What Impact Would Allowing All Issues of "The Five Percenter" Have on Others and Prison Resources?* . . . . . . . . . . . . . . . . . . . . . | 21 |
|  |  |  | (4) *Are There Alternative Ways to Achieve the Prison's Interests?* . . . . . . . . . . . . . . . . . . . | 22 |
|  | 3. |  | *Mail* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
|  |  | a. | *Exhaustion of Administrative Remedies* . . . . . . . . . . | 23 |
|  |  | b. | *Substantial Burden* . . . . . . . . . . . . . . . . . . . . . . | 23 |
|  |  | c. | *Legitimate Penological Objective* . . . . . . . . . . . . . . | 24 |
|  |  |  | (1) *Is There a "Valid Rational Connection" Between the Restriction on Mail Without Legal Names and the Prison's Legitimate Interests?* . . | 24 |
|  |  |  | (2) *Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?* . . . . . . . | 25 |
|  |  |  | (3) *What Impact Would Allowing Mail Without Legal Names Have on Others and on Prison Resources?* . . . . . . . . . . . . . . . . . . . . . . | 25 |
|  |  |  | (4) *Are There Alternative Ways to Achieve the Prison's Interests?* . . . . . . . . . . . . . . . . . . . | 26 |
| V. | *SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 26 |
| VI. | *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 27 |

# I. INTRODUCTION

This is a prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff Duane Wright filed this claim against Warden John Fayram, deputy warden William Sperfslage, and treatment director Tracy Dietsch. An evidentiary hearing was held at the Anamosa State Penitentiary on June 4, 2014. Plaintiff Duane Wright appeared personally and was unrepresented by counsel. Defendants John Fayram, William Sperfslage, and Tracy Dietsch appeared personally, together with their attorney, Forrest Guddall.

# II. PROCEDURAL HISTORY

On August 13, 2013, Plaintiff Duane Wright filed an application to proceed in forma pauperis, together with a Complaint asserting prison officials are not allowing him to freely exercise his religion. Wright claims Defendants have violated his First Amendment rights by denying him religious publications, including a religious newspaper, refusing to establish an institutional account to allow him to purchase religious publications, and restricting mail correspondence with other members of Wright's religion. On September 4, 2013, the district court granted Wright's motion for leave to proceed in forma pauperis. Defendants filed an answer on October 4, 2013, admitting some facts alleged by Wright and denying others. Defendants admit that Wright has been denied some publications and has been denied an institutional account, but assert that Wright failed to exhaust his administrative remedies. Pursuant to 28 U.S.C. § 636(b)(1)(B), Judge Edward J. McManus referred the case to me for a report and recommendation.

# III. RELEVANT FACTS

## A. First Lawsuit

Wright has been incarcerated for murder since 1984, and served the first twenty-two years of his sentence at the Iowa State Penitentiary in Fort Madison. In 2006, he was transferred to the Anamosa State Penitentiary ("ASP"). Wright is a member of the Nation of Gods and Earths ("NGE"), a religion stemming from Nation of Islam and sharing many religious texts with Nation of Islam.

On January 3, 2011, Wright filed a Complaint in this Court against warden John Fayram, treatment director Tracy Dietsch, and chaplain Reverend Rick Jenkins.[1] Wright alleged that the defendants refused to officially recognize and accommodate his religious beliefs by improperly classifying his religion as a security threat group and not allowing him group worship. On February 22, 2012, an evidentiary hearing was held at ASP. Prior to the hearing, prison officials had accommodated Wright by making arrangements for his fasts and allowing Wright to receive some issues of a religious newspaper. On June 18, 2012, I issued a report, finding NGE is entitled to protection under the First Amendment, but recommending the claim be dismissed for a lack of Article III standing. That is, Wright's claim of being denied group worship was not ripe because he was a congregation of one. On July 10, 2012, Judge Edward J. McManus adopted the Report and Recommendation, dismissing the claim. The case was not appealed.

## B. After the First Lawsuit

Since the time of the first lawsuit, others have joined Wright as members of NGE. The prison has accommodated Wright and other inmates by making arrangements for them to fast on required fasting days and by allotting them chapel space every Tuesday and every third Sunday of the month. The prison has also photocopied some religious materials for members.

Wright claims, however, that the prison is not allowing him and the other NGE members to fully practice their religion. In his Complaint, Wright identifies four issues: (1) prison officials have repeatedly denied NGE members their "lessons"; (2) the NGE has been denied an institutional account to purchase religious materials, (3) he is being denied "The Five Percenter" newspaper; and (4) he is having his religious mail restricted.

---

[1] *See Duane Wright v. John Fayram, et al.*, No. 1:11-cv-00001-EJM (N.D. Iowa 2011).

In addition to these claims, Wright and two witnesses testified that an item was donated to the NGE for display in the chapel, but rejected by prison officials. Anthony Welch, an inmate at the prison, crafted a twelve inch by twelve inch mirror and frame with a painted NGE symbol. Welch submitted the mirror for display in the chapel, but it was refused. It was not displayed in the chapel, and was never received by the NGE or returned. Wright believes the rejection of this donation is further evidence of the prison's disparate treatment of NGE. At the hearing, Dietsch testified that prison policy does not allow items made with glass to be displayed in the chapel.

## C. Religious Publications

Wright's first claim is that he is not able to order NGE publications or "lessons." Wright leads weekly classes at the prison for several other NGE members, who testified their only access to NGE materials were those provided by Wright for the group to use during their meetings. However, NGE members also study other religious texts, such as the Bible and the Koran, which are apparently readily available.

On November 27, 2012, Wright submitted to the prison an order form and a money order for two NGE books, including "The Book of Life," a mandatory book for all members. "Divine God Allah" was listed on the form as the supplier.[2] Dietsch approved the form for mailing to the supplier, but the books were rejected by prison officials upon arrival. Dietsch testified that the books were not approved by the prison because they were not received from an approved vendor. When Wright did not receive the books he ordered, he spoke with Sperfslage and Dietsch about the issue. Wright was told that he could not receive the books because they were not from an approved vendor. Wright then wrote a letter to Fayram on the issue, but did not receive a response.

---

[2] Plaintiff's Exhibit 9.

To obtain religious materials at the prison, an inmate must order items from an approved vendor with funds in an institutional account.[3] NGE has neither an approved vendor, nor an institutional account. Wright's claims concerning an institutional account will be addressed in the next section. According to Dietsch, the vendor approval process entails filling out a form, speaking with the chaplain about that form, having the chaplain research the vendor, having the chaplain fill out an additional form to be submitted to the treatment director, speaking with the treatment director about the form, having the treatment director make a recommendation to the statewide religious coordinator, and then having the statewide religious coordinator approve the vendor.

The reason behind the approved vendor policy is to prevent money and correspondence from going to a location that is ostensibly a bookstore, but is actually hiding illegal activities. In addition, by having an approved vendor that is an established business, such as Barnes and Noble, it is less likely that materials purchased would be altered or contain contraband. Dietsch also testified that in approving vendors, prison officials seek to find a single vendor that can provide for all of the group's needs, rather than many individual vendors.

Wright has not attempted to order any additional publications, in part because he assumes they would be sent with a religious name and that he would probably not receive them because of that. NGE members believe that their names were taken from them and it is a part of their religion to rename members with religious or "righteous" names.[4] Examples of these names include "Born King Allah" and "Divine God Allah." Wright's religious name is Asiatic Knowledge Allah. Wright's incoming and outgoing mail is routinely rejected for using a religious name.

---

[3] Defendants' Exhibit B at 2.

[4] Plaintiff's Exhibit 14 at 1.

Several NGE members testified at the hearing that they are not able to obtain NGE religious publications and further their education about NGE. However, no other NGE member has tried to order publications. Wright has instructed them to not attempt to order materials until he is sure that they will go through. As leader of the group, Wright has attempted to get these materials for the other members.

Wright has never filled out the form to obtain an approved vendor. Wright believes prison officials would not accept Divine God Allah as an approved vendor because of Wright's problems with mail regarding other NGE members. Because his mail to and from Born King Allah and others with religious names have been rejected for not having a legal name, Wright assumes that attempts to make Divine God Allah the vendor for the prison's NGE group would likely be rejected as well. Wright has been unable to find any other vendors to provide NGE materials. According to Dietsch, she and Chaplain Jenkins have also been unable to locate a vendor for NGE materials.

The Religious Programming Policy (Defendants' Exhibit JJ) provides an alternate route to an approved vendor. According to the policy "[a]ny request to purchase specific religion's resources available only through a sole source vendor, must be reviewed/approved by the Spiritual Activities Coordinator prior to ordering."[5] It appears NGE's materials are only available through a sole source vendor, meaning there is only one place to get many of these publications. There was no testimony on whether Wright was advised of this policy, but it is undisputed that Wright did not avail himself of this procedure.

Dietsch testified that Wright could personally order the books from a non-religious approved vendor as an alternative to a religious approved vendor. While each religion must have a designated approved vendor to buy religious supplies for the group, individual inmates can personally order publications for themselves from other approved vendors

---

[5] Defendants' Exhibit JJ at 9.

such as Bargain Books, or Barnes and Noble. Wright already has some of his own NGE publications that he shares with the group during meetings, but is seeking additional publications for the group to have as an institutional organization.

## D. Institutional Account

An institutional account is an account set up in the name of a group within the prison. Inmates can contribute to the account, and the group can then purchase items for the group. Books purchased from the institutional account are the property of the group, not individual inmates, and inmates would be able to use them during group meetings and check them out at other times. Currently, NGE members have to share copies of the text they are studying or copy it down by hand. In addition to purchasing books and other materials for meetings, Wright wants an institutional account so NGE can purchase food to prepare their own meals on holy days.

Wright gave the chaplain a money order to open up an institutional account for the NGE, and also spoke with Dietsch about starting an account. Dietsch did not allow NGE to establish a group account, however, because Wright did not identify what group supplies were needed and did not have an approved vendor for those supplies. Wright has not made another attempt to open an institutional account or appeal Dietsch's decision to not start an institutional account for NGE.

Prison policy prohibits an institutional account until a group identifies a standing order for religious supplies and has an approved vendor for those supplies.[6] Dietsch testified that because of the paperwork and labor involved in balancing the account, she does not allow groups to open accounts unless there are supplies necessary to practice the religion. Not all religious groups at the prison have institutional accounts, but several smaller groups such as Asatru, a small Icelandic religion, have been able to establish an institutional account.

---

[6] *See* Defendants' Exhibit EE at 1.

## E. "The Five Percenter"

Wright claims that he has been denied issues of "The Five Percenter," a monthly newspaper for NGE members. Between July 2006 — when Wright came to the prison — and September 2013, Wright has had fifty-one regular editions of "The Five Percenter" sent to him. Of those, a total of fourteen issues have been denied. Of the fourteen denials, six issues were denied between February 2013 and September 2013. Four of those six denials were made by the Publications Review Committee ("PRC"), and two were made by Sperfslage.[7] Although the issues are around twenty-seven pages long according to Wright, the Iowa Department of Corrections ("IDOC") has a policy of either approving or denying the entire publication, electing to not redact or otherwise remove unapproved portions from a publication.

Defendants included records from the PRC regarding the denials of five issues, all cited with "F6" as the reason for denial.[8] Publications can be rejected for several reasons, and reason "F6" denies a publication because it:

> Contains materials that compromise the security of the institution, such as: materials which illustrate, explains, describe, or teach martial arts, or other manufacture of weapons or explosives, or advocate behavior contrary to duly established institutional rules or Iowa statutes; materials which illustrate, explain, describe, or teach ability to frustrate crowd or riot control methods; materials which illustrate, explain, describe, or teach ability to sabotage or disrupt communications networks including internal and external communications and automated information systems; materials which illustrate, explain, describe, or teach ability to

---

[7] Defendants' Exhibit II at 3-6. Sperfslage only reviewed four issues, initially denying three of them and then approving one after a conversation with Wright.

[8] Defendants' Exhibits R at 2, S at 2, V at 2, BB at 3-4.

> manipulate in any form or fashion locking devices, security restraints, or equipment, etc.[9]

To appeal the denial of a publication, the inmate must submit a written appeal to Jean Schlichtemeier, the division of investigative services administrator. Wright appealed the PRC's denial of one issue of "The Five Percenter" to Schlichtemeier, and received a response in May 2013. It is unclear if Wright appealed any other denied issues. According to Schlichtemeier's letter to Wright, the IDOC approved the publication "subject to religious review" at the prison.[10] Pursuant to Schlichtemeier's letter, Sperfslage reviewed the publication from June until August 2013. Sperfslage testified that of the four issues he reviewed, he rejected three of them for having gang hand signs. Gang hand signs are a threat in prison because inmates might post them in their cells to intimidate others. After a conversation with Wright, however, Sperfslage approved a publication he had previously rejected, when Wright convinced him the hand signs were the NGE hand sign for peace.

In December 2013, Wright received a letter from Barb Van Allen, assistant ombudsman for the State of Iowa, who informed Wright that "The Five Percenter" would cease to be reviewed by Sperfslage and would instead be submitted to the normal publication review process.[11] According to Sperfslage, this change was brought on by a decision of the deputy directors of the IDOC. The record does not reflect whether subsequent issues of "The Five Percenter" have been approved or denied, and Sperfslage testified that he believes there haven't been any issues put through to the PRC since September 2013.

---

[9] Defendants' Exhibit B at 5.

[10] Plaintiff's Exhibit 15 at 1.

[11] Plaintiff's Exhibit 16 at 1.

## F. Mail

Wright claims he is not being allowed to correspond with his religious associates because some of his incoming and outgoing mail is rejected by the prison. Defendants' exhibits chronicle six mail rejections: outgoing mail was rejected in August 2012 because it was addressed to "Born King Allah" and contained numbers that could be a code; in October 2012 incoming mail was rejected from "Born King Allah"; in January 2013 outgoing mail was rejected because it was addressed to "Divine God Allah"; during the same month incoming mail was rejected because it was from "B C Allah"; in March 2013 incoming mail was rejected coming from "Asiatic God Equality Allah";and in August 2013 outgoing mail addressed to "Born King Allah" was denied. Wright was notified of each denial by a form that states the reason the piece of mail was denied. All of Wright's denials are marked as "sender is not identified."[12] In August 2013, Wright exercised an internal appeal process. The returned appeal cites the same reason that initially rejected the mail.[13]

Mail policies are enforced through random mail checks and, according to Sperfslage, there are three main reasons why Wright's mail is being denied. First, the Offender Correspondence Policy requires that all incoming and outgoing mail include the full name for the address and return address.[14] Prison officials have interpreted this to mean the full *legal* name of both the sender and recipient. According to Wright, NGE members call each other by their religious names, rather than their legal names. However, in one letter to Wright, Born King Allah also uses the name David Palmer.[15] Wright testified that he knows David Palmer could be Born King Allah's legal name, but there is

---

[12] Defendants' Exhibits E, F, N, O, U, and CC.

[13] *See* Plaintiff's Exhibit 8 at 1.

[14] Defendants' Exhibit C at 4.

[15] Plaintiff's Exhibit 14 at 1.

a possibility David Palmer could have legally changed his name to Born King Allah. According to Wright, David Palmer is Born King Allah to him. Wright admits that he rewrote a rejected letter, addressed it to David Palmer, and that it was approved as rewritten. While Wright knows that Born King Allah's legal name was David Palmer, Wright testified he does not know the legal name for some of his other NGE contacts.

Sperfslage identified a second reason for mail to be rejected: the names and addresses provided must match up. Sperfslage testified that he ran some names and addresses from Wright's letters through the Fusion Center — an information sharing program for state and federal criminal justice institutions — to see if the names and addresses matched up and to check if the recipient had a criminal background. Sperfslage only runs names and addresses through the Fusion Center when he thinks there might be communication with a security threat group. Mail is not allowed to be sent to victims or their families, or to inmates at other institutions. Matching up names and addresses is one way of making sure that mail isn't sent to a prohibited recipient.[16] The addresses and religious names from Wright's letters did not match.

The third reason that Wright's mail was rejected is because prison policy does not allow mail to be coded or written in a way to conceal meaning.[17] NGE studies "Supreme Mathematics " and the "Supreme Alphabet," which both align a number or letter with a word. Sperfslage believes that "Supreme Mathematics" and the "Supreme Alphabet" may be a code. However, the words corresponding to the numbers and letters are well known, and have fairly innocuous meanings, such as "understanding," "wisdom," "culture," and "knowledge."

---

[16] Sperfslage also testified about the inmate practice of sending a letter to a bogus address, but with a return address to another inmate, to effectively send mail to another inmate.

[17] Defendants' Exhibit C at 5.

## IV. DISCUSSION

### A. Applicable Legal and Procedural Framework

#### 1. Article III Standing — Ripeness Doctrine

The Court must first consider whether Wright has standing to bring his claims. The standing requirement's timing component — the ripeness doctrine — is most applicable here. The ripeness doctrine is rooted in the "jurisdictional limits of Article III of the Constitution and policy considerations of effective court administration." *KCCP Trust v. City of North Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005). The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The question of ripeness turns on (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* at 149. In the Eighth Circuit, both prongs must be satisfied "to at least a minimal degree." *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (2000).

The "fitness for judicial decision" prong of *Abbott*'s two-part test addresses a "court's ability to visit an issue." *Id.* at 1038. It is intended to "safeguard against judicial review of hypothetical or speculative disagreements." *Id.* "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

The "hardship" prong of the *Abbott* test goes to the harm resulting to the parties from delayed review. "'Harm' includes both the traditional concept of actual damages, pecuniary or otherwise, and also the heightened uncertainty and resulting behavior modification that may result from delayed resolution." *Nebraska Pub. Power*, 234 F.3d at 1038 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-34 (1998)).

13

However, "a party need not wait for actual harm to occur"; an action is ripe if a plaintiff faces an injury that is "certainly impending." *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1008-09 (8th Cir. 1998). Together, the immediacy and size of the threatened harm must be significant to find ripeness. *Nebraska Pub. Power*, 234 F.3d at 1038.

## 2. *Exhaustion of Administrative Remedies*

Prior to filing a complaint over prison conditions, a prisoner must also exhaust all administrative remedies. 42 U.S.C. § 1997e ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see generally Porter v. Nussle*, 534 U.S. 516 (2002) (discusses exhaustion of administrative remedies); *Booth v. Churner*, 532 U.S. 731 (2001)(same). If a prisoner does not exhaust his administrative remedies before filing suit, then "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). The defendant bears the burden to show that a plaintiff prisoner failed to exhaust all remedies. *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2001).

## 3. *Color of State Law*

"[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements of a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Typically "[p]rison authorities are clearly 'persons acting under color of state law' within the meaning of the first element" of *Parratt*. *Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir. 1994). Here, it is undisputed Defendants were acting under color of state law.

### 4. Sincerely Held Religious Beliefs

Wright must next prove that Defendants prohibited his free exercise of religion in violation of the First Amendment, and therefore deprived him of a right secured by the Constitution. *Parratt*, 451 U.S. at 535. "First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences." *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000). In the first lawsuit, I concluded Wright's adherence to the NGE is a sincerely held religious belief.

### 5. Substantial Burden

If Wright's adherence to the NGE constitutes a sincerely held religious belief, then the Court must next determine whether Defendants' actions have infringed upon those religious beliefs. *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (8th Cir. 2009).

> Substantially burdening one's free exercise of religion means that the regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (quotations omitted).

### 6. Turner Factors

If the Court determines that Defendants' actions infringe upon Wright's sincerely held religious beliefs, then it must determine whether the restriction "is reasonably related to legitimate penological objectives." *Gladson*, 551 F.3d at 831. In making that determination, the Court must consider the four factors identified in *Turner v. Safley*, 482 U.S. 78 (1987). However, the Court gives "great deference to the judgment and expertise of prison officials, particularly with respect to decisions that implicate institutional security." *Gladson*, 551 F.3d at 831-32 (quoting *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004)).

15

The Supreme Court established the four-factor *Turner* analysis to evaluate the reasonableness of a given regulation. The four inquiries are: (1) whether there is a "valid rational connection" between the restriction and the legitimate interest put forward to justify it; (2) whether there are other ways for the prisoner to exercise his rights despite the restriction; (3) the impact an accommodation may have "on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are alternative ways to achieve the penological interest. *Turner*, 482 U.S. at 89-90. In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987), handed down one week after *Turner*, the Court applied the *Turner* factors in an action involving the free exercise of religion. In concluding that the regulations did not offend the Free Exercise Clause of the First Amendment to the United States Constitution, the Court took "this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on difficult and sensitive matters of institutional administration,' for the determinations of those charged with the formidable task of running a prison." *Id.* at 353 (citation omitted). In the absence of substantial evidence indicating officials have exaggerated their response to prison security considerations, courts should ordinarily defer to their expert judgment. *Fegans v. Norris*, 537 F.3d 897, 903 (8th Cir. 2008).

### B. Application

#### 1. Religious Publications and Institutional Account

##### a. Article III Standing

Wright alleges Defendants have denied him religious publications and an institutional account. However, Wright has not followed the prison's procedure for ordering religious publications or for opening an institutional account. Policy requires Wright to order publications from an approved vendor. The prison has not allowed Wright to have the publications he ordered because they were not from an approved vendor. Similarly, the policy for obtaining an institutional account requires Wright to identify an approved vendor and supplies needed. Because Wright has not completed the steps to open

an institutional account, prison officials have not allowed NGE to open an institutional account. Prison officials have denied Wright his ordered NGE publications and an institutional account because he has not followed the prison's procedure. Therefore, there has been no formal decision on the merits whether to allow Wright NGE publications or an institutional account.

Before the Court can properly visit this issue, Wright must follow prison procedure to seek approval of an authorized vendor, and then order religious materials or open an account following the appropriate procedure. It is impossible to predict prison officials' actions if Wright were to follow the proper procedures, and therefore injury is not "certainly impending." To provide relief on the basis of such speculation would violate the "fitness" prong of the ripeness doctrine. *See Nebraska Pub. Power Dist.* at 234 F.3d at 1038 (stating that the fitness prong is intended as a "safeguard against judicial review of hypothetical or speculative disagreements"). Because no formal decision has been made on whether to allow Wright NGE publications or an institutional account, there is no "hardship" to Wright and other NGE members because nothing has been denied on the merits. *See Texas* 523 U.S. at 300 ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all"). Wright's claims involving religious publications and an institutional account fail the ripeness requirement and lack standing; I recommend this issue be dismissed.

### *b.    Exhaustion of Administrative Remedies*

The next consideration by the Court is whether Wright has exhausted his administrative remedies. By correctly following the procedure for ordering religious publications and opening an institutional account, Wright has administrative remedies still available to him. Even if Wright had standing in this matter, because Wright has not completed the procedure to order religious publications or open an institutional account, Wright has not exhausted his administrative remedies.

Wright testified at the hearing that he thought attempts to make Divine God Allah the vendor for the prison's NGE group would likely be rejected because his mail with Born King Allah and others with religious names have been rejected for not having a legal name. However, even if Wright assumes that Divine God Allah will be denied as an approved vendor, "there is no futility exception to Prison Litigation Reform Act's (PRLA) administrative exhaustion requirement." *Flanyak v. Hopta*, 410 F. Supp. 2d 394, M.D. Pa. 2006. Wright cannot claim that he has exhausted all of his administrative remedies, even if he believes such attempts will be futile, when he has not followed the appropriate procedure to make Divine God Allah an approved vendor. Even if Wright's claims concerning ordering religious publications and opening an institutional account were ripe with Article III standing, Wright has not exhausted his administrative remedies and the claim should be dismissed.

Wright's failure to follow the prison's procedure for ordering publications and opening an institutional account is fatal to this claim. Because he has not followed the prison's procedure, there is no decision on the merits made by Defendants to approve or deny his publications and institutional account. Without a decision to review, there is no standing for Wright to bring the claim. Additionally, Wright still has administrative remedies available to him. I recommend that Wright's claims involving the denial of religious publications and an institutional account be dismissed.

2.    *"The Five Percenter" Newspaper*

    a.    *Exhaustion of Administrative Remedies*

No one challenges whether Wright has standing on this issue; therefore, the Court will move to the issue of exhaustion. Wright alleges that the prison denied him issues of "The Five Percenter." Incoming publications at ASP are sent to the Iowa State Penitentiary in Fort Madison to be reviewed by the Publications Review Committee ("PRC"), then approved or denied and sent back to ASP. At ASP, inmates are notified if their publication was approved or denied. Once inmates have notice of the PRC denying

a publication, they can appeal that decision to Jean Schlictemeier, who handles publication review appeals. Wright has appealed at least one denied issue of "The Five Percenter" to Schlictemeier, who granted his appeal and allowed "The Five Percenter" to be reviewed at the prison as a religious publication. During the time that "The Five Percenter" was reviewed within ASP, Deputy Warden Sperfslage reviewed the publication, and denied three of four issues. Wright appealed to Sperfslage, who granted Wright's appeal and approved an additional issue. After that, Wright was notified that the PRC would again be reviewing "The Five Percenter." Wright has apparently not received any issues for the PRC to review since then.

No clear answer exists as to whether or not Wright has to appeal each issue that he was denied. In *Brown v. Ray*, 695 F. Supp. 2d (W.D. Va. 2010), the Court suggests that a prisoner must appeal each and every issue. Similarly, *Shabazz v. Virginia Dep't of Corr.*, 2011 WL 4025264 (E.D. Va.), suggests that if an inmate's claims involve a blanket ban on publications, an appeal of two individual issues is not sufficient to exhaust administrative remedies. However, the process to exhaust administrative remedies and then file a separate suit for each issue would be quite cumbersome and possibly discourage legitimate claims.

In this case, Wright availed himself of the appeals process at least two times. Is it unclear whether he appealed all denied issues of "The Five Percenter" or just individual issues. It's the Court's understanding that all rejected issues of "The Five Percenter" were rejected because of hand signs.[18] Because Wright has appealed on the matter of rejecting "The Five Percenter" for having hand signs, and all other issues of the newspaper were rejected for the same reason, Wright has sufficiently exhausted his administrative remedies on this matter. The Court concludes that Defendants have failed to meet their burden of

---

[18] There is no evidence to suggest that "The Five Percenter" was rejected for any reason other than hand signs. However, my analysis on this issue is hindered by the fact that neither party offered any issue of "The Five Percenter" into evidence.

proving that Wright failed to exhaust his administrative remedies. *See Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (discussing the defendant's burden of proving a failure to exhaust administrative remedies).

### b. Substantial Burden

The Court must next determine whether denial of "The Five Percenter" substantially burdens Wright's free exercise of religion. Given the nature of NGE and their limited membership, I believe that "The Five Percenter" constitutes a type of religious community and is an important aspect of NGE membership. Because of the limited number and availability of other means to study NGE principles, "The Five Percenter" is an important tool for practicing and learning NGE beliefs. Other courts have agreed that restricting "The Five Percenter" constitutes a substantial burden. *See Marria v. Broaddus*, 2003 WL 21782633 at 13. (S.D.N.Y.) ("[I]n a religious community that lacks both a formal organizational structure and a fixed place of worship, The Five Percenter newspaper serves as a central link and mechanism of communication."); Ciempa v. Jones 745 F. Supp. 2d 1171, 1188 (N.D. Okla. 2010) (finding that restricting "The Five Percenter" constitutes a substantial burden). I believe the Defendants' refusal to allow "The Five Percenter" places a substantial burden on Wright's free exercise of religion.

### c. Legitimate Penological Objectives

Because denying "The Five Percenter" substantially burdens Wright's free exercise of religion, the Court must next determine whether the restriction "is reasonably related to legitimate penological objectives," by considering the following four factors found in *Turner v. Safley*, 482 U.S. 78 (1987).

#### (1) Is There a "Valid Rational Connection" Between the Restrictions on "The Five Percenter" and the Prison's Legitimate Interests?

The restriction in place here is the "Incoming Publications Policy." This policy exists, in part, to preclude gang activities. Institutional security is "the most compelling

20

government interest in a prison setting." *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996). In rejecting Wright's publications, the PRC cited "F6" as the reason for denial, indicating that it "[c]ontains materials that compromise the security of the institution."[19] Further, Sperfslage testified that he rejected issues for having gang-related hand signs. Sperfslage explained concerns about hand signs and gangs within a prison, namely that hand signs can encourage or facilitate gangs. Sperfslage also testified that inmates could use newspapers as a sign of allegiance to a certain group or to intimidate others. Hand signs within a prison are a legitimate concern, and a rational connection exists between limiting publications with hand signs and protecting the security of the institution.

### (2)   Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?

The second factor identified in *Turner* is whether there are other ways for the prisoner to exercise his rights despite the restriction. *Turner*, 482 U.S. at 90. The right in question here is the right to practice religion, not the right to read a religious newspaper. *See Iron Eyes v. Henry*, 907 F.2d 810, 815 (8th Cir. 1990). Wright can certainly still be a member of NGE without receiving "The Five Percenter," and has gone through several periods of time in which he has not received the newspaper. In addition, Defendants allow Wright some editions of the newspaper and have accommodated several other aspects of Wright's religion, by allowing him weekly and monthly chapel times and by accommodating his fasts. Because Wright can still practice his religion without receiving "The Five Percenter," Wright can still exercise his rights despite the occasional restriction of the newspaper.

### (3)   What Impact Would Allowing All Issues of "The Five Percenter" Have on Others and Prison Resources?

There is a risk that allowing "The Five Percenter" will contribute to security threat groups within the prison. NGE is not classified as a security threat group, and Wright is

---

[19] See Defendants' Exhibits R at 2, S at 2, V at 2, BB at 3-4.

not known to be a gang member at ASP. However, Sperfslage testified that "The Five Percenter" occasionally includes various hand signs, some belonging to other gangs recognized within the prison system. Other courts have agreed that "allowing inmates to receive material that contains gang symbols or other threatening content would have a significant negative impact on other inmates and prison guards because it would make the prison environment less safe." *Ciempa*, 745 F. Supp. 2d at 1189.

### (4) Are There Alternative Ways to Achieve the Prison's Interests?

A restriction on a prisoner's free exercise of religion must be reasonable. The *Turner* Court suggested that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation. (citation omitted) By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. Neither party presented evidence on alternatives, and there are no apparent alternatives that could be implemented at a "de minimus" cost to the prison. *See Turner*, 482 U.S. at 90-91, 107 S. Ct. at 2262-63.

After considering the four *Turner* factors, and giving great deference to the judgment and expertise of Defendants, the Court concludes that having the prison or the PRC review "The Five Percenter" on an issue-by-issue basis for security concerns does not violate Wright's freedom of religion. The prison does have legitimate concerns regarding hand signs in prison, but Wright can effectively practice NGE without receiving every issue of "The Five Percenter." Further, there is a security risk if the prison allows Wright to receive issues of "The Five Percenter" that have been deemed a security threat. An issue-by-issue review appears to be the least restrictive means possible of achieving this penological goal. Accordingly, I recommend that Wright's claim involving "The Five Percenter" be dismissed.

### 3.    *Mail*

#### a.    *Exhaustion of Administrative Remedies*

There are no challenges as to standing on this issue; therefore, the Court will move to the issue of exhaustion. Wright has been denied several incoming and outgoing pieces of mail. When mail is denied, a form is sent to the inmate detailing the reasons for its denial. On that form, the inmate is told the procedure to appeal. Wright has appealed at least once through a "rejected mail appeal form," but the decision was affirmed for the same reason: there was no legal name on the envelope. The decision on the "rejected mail appeal form" is final, and there is no further appeals process.

Wright has the option to remedy his injury by writing to his NGE contacts with their legal names instead of their religious names. However, Wright does not know the legal names of many of his NGE contacts. While some incoming and outgoing mail has been sent out or received by Wright with religious names, if Wright does not know the legal names of his affiliates, it would be impossible for Wright to be able to communicate with them, even in an attempt to ask for their legal names for mail correspondence.

Because Wright has appealed at least one piece of mail, and all of his rejected mail violates the same prison policies, I believe that Wright has exhausted his administrative remedies. The Court concludes that Defendants have failed to meet their burden of proving that Wright did not exhaust his administrative remedies. *See Foulk v. Charrier*, 262 F.3d at 697 (discussing the defendant's burden of proving a failure to exhaust administrative remedies).

#### b.    *Substantial Burden*

The next inquiry is whether Defendants' restriction substantially burdens Wright's free exercise of religion. Communication with other NGE members is important to Wright being able to facilitate the practice of his religion. If Wright is unable to communicate with other NGE members, Wright will likely not be able to obtain religious publications or to contact a possible group sponsor for the NGE group at the prison. As long as Wright

is unable to find the legal names of NGE members to communicate with, Wright will be substantially burdened by the prison's policy of requiring legal names.

Conversely, communication with other NGE members using "Supreme Mathematics" and the "Supreme Alphabet" is not a fundamental part of Wright's religion. None of the materials provided to the Court about NGE include information on communicating using "Supreme Mathematics" or the "Supreme Alphabet," but instead reference these as texts to study and memorize. Wright is able to read and discuss these texts with other NGE members at their weekly and monthly meetings. Wright's free exercise of his religion is not substantially burdened by the prison's policy of prohibiting the use of code in mail. Because the prison's restriction of using code in mail does not substantially burden Wright's religion, the restriction stands and Wright's claims involving codes in mail must be dismissed.

### c.   *Legitimate Penological Objective*

#### (1)   *Is There a "Valid Rational Connection" Between the Restriction on Mail Without Legal Names and the Prison's Legitimate Interests?*

The Court must determine whether the regulation in question serves a legitimate penological objective. In making this determination, the Court considers the four factors found in *Turner*. There are two different restrictions concerning Wright's use of religious names on his mail, both of which have a rational connection with a legitimate interest of the prison. First, the prison does not allow mail to be sent out when the names and addresses do not match up. Second, the prison does not allow mail to be sent or received without a legal name. Both of these regulations are in furtherance of legitimate concerns involving inmates communicating with restricted contacts. Inmates are not allowed to contact victims or their families, as well as known security threats, like gang leaders. Security concerns are recognized as "the most compelling governmental interest in a prison setting." *Ochs*, 90 F.3d at 296. The Court concludes that there is a valid rational

connection between the restrictions imposed on an inmate's mail and the legitimate security concerns of the prison.

### (2) Are There Other Ways for Wright to Exercise His Religion Despite the Restriction?

While sending mail is not a central tenet of NGE beliefs, reading religious publications is a central part of Wright's religious activities. Wright needs to be able to communicate with his religious affiliates to order publications or to find a group sponsor. Wright cannot write to many of his religious affiliates using their legal names, because he does not know their legal names. Arguably, there are no alternatives for Wright to be able to order publications, other than to use legal names. However, Wright does know the legal name of at least one NGE member (David Palmer). Further, the "right" in question is Wright's right to practice NGE, not to send and receive mail. *See Iron Eyes v. Henry*, 907 F.2d at 815 (discussing that the rights protected under the First Amendment are the rights to practice religion). Because Wright has several publications already, and the prison has made several accommodations that allow Wright to practice NGE, Wright is able to exercise his freedom of religion even without being able to send mail to or from religious names. *See Ciempa*, 745 F. Supp. 2d at 1189 ("the mere diminishment, as opposed to complete denial, of [plaintiff's] spiritual experience is relevant in determining whether the proffered penological interests suffice to justify the infringement.").

### (3) What Impact Would Allowing Mail Without Legal Names Have on Others and on Prison Resources?

The third consideration described in *Turner* is the impact an accommodation will have on guards and other inmates, and on the allocation of prison resources generally. Here, if Defendants eliminated the restriction on mail with non-legal names or names and addresses that don't match up, mail could be sent out to victims or individuals that pose a security threat. Again, security concerns are "the most compelling governmental interest

in a prison setting." *Ochs*, 90 F.3d at 296. The potential impact on the prison prevents Defendants from lifting the restrictions on mail.

### (4)    Are There Alternative Ways to Achieve the Prison's Interests?

The only obvious alternative to requiring the use of legal names is to have mail room staff research the addresses of all recipients without legal names listed to ascertain whether the person can be identified, whether they are registered at that address, and whether the recipient is a prohibited contact or a security threat. This alternative would be cost- and time-prohibitive, and could not be implemented at a "*de minimus*" cost to the prison. *See Turner*, 482 U.S. at 90-91, 107 S. Ct. at 2262-63 (discussing the requirement that any alternative have only a minimal cost to the prison).

After considering the four *Turner* factors, and giving great deference to the judgment and expertise of Defendants, the Court concludes that the refusal to allow Wright to send correspondence to members of NGE using a religious name is reasonably related to legitimate penological objectives. Accordingly, I recommend that Wright's claims challenging the prison's requirement of legal names and addresses on mail be dismissed.

### V.  SUMMARY

In summary, I do not believe that Wright is entitled to relief on his claims involving religious publications and an institutional account, because the issue is not ripe for a decision and because Wright still has administrative remedies available to him. Because Wright never completed the process to open an account or order materials, the administration has not made a formal decision concerning whether the NGE is allowed to have publications or open an institutional account. Wright can still elect to follow the proper process. I recommend Wright's claims involving religious publications and an institutional account be dismissed.

Wright's claims involving "The Five Percenter" and mail with religious names do not afford Wright relief. The prison's policy prohibiting hand signs in publications serves a legitimate penological objective. The same is true of the prison's policy requiring legal

names on incoming and outgoing mail. Therefore, I recommend that these claims also be dismissed.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommended that the Complaint (docket number 5) filed by the Plaintiff be **DISMISSED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the District Court. *Defendant is reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if Defendant is going to object to this Report and Recommendation, he must promptly order a transcript of the hearing held on June 4, 2014*

DATED this 30th day of July, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA